UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-23618-CIV-O'SULLIVAN
[CONSENT]

MARIA DEL CARMEN FLORES,
        Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security Administration,[1]
        Defendant.

_____/

## ORDER[2]

THIS MATTER is before this Court on the Motion for Judgment by the Pleadings
(DE # 20, 3/22/13) filed by the plaintiff and the Defendant's Motion for Summary
Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for
Summary Judgment (DE # 24, 4/22/13) (hereinafter "Defendant's Motion for Summary
Judgment").

## PROCEDURAL HISTORY

The plaintiff seeks reversal of the decision of the Commissioner of Social
Security denying the plaintiff's claim for disability insurance benefits. On September 4,
2008, the plaintiff filed an application for disability insurance benefits under Title II of the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. Fed. R. Civ. P. 25(d). No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

[2] On January 9, 2013, the parties consented to magistrate judge jurisdiction for the final disposition of this case. See Parties' Consent to Magistrate Jurisdiction (DE # 16, 1/9/13). On January 10, 2013, United States District Judge Seitz referred this case to the magistrate judge for all further proceedings including the entry of final judgment. See Order of Reference (DE # 17, 1/10/13).

Social Security Act, 42 U.S.C. § 401, et seq. (Tr. 179-85).[3] In her application, the

plaintiff alleged that she became disabled on June 10, 2008. (Tr. 181). The plaintiff's

application was denied initially on December 8, 2008 (Tr. 92-94) and upon

reconsideration on February 6, 2009. (Tr. 98-99).

After the denials, the plaintiff requested a hearing before an Administrative Law

Judge (hereinafter "ALJ"). (Tr. 113-114). An administrative hearing was held on

September 13, 2010. (Tr. 45-88). At the September 13, 2010 hearing, the ALJ heard

testimony from the plaintiff, the plaintiff's son (Jelanis Flores) and a vocational expert

(hereinafter "VE"). (Tr. 46). On November 22, 2010, the ALJ issued her decision finding

that the plaintiff did not meet the Social Security Act's definition of disability during the

relevant period. (Tr. 28-40). Thereafter, the plaintiff filed a request for review with the

Appeals Counsel, which was denied. (Tr. 1-5). As a result of the denial, the plaintiff filed

a complaint with this Court on October 4, 2012. See Complaint (DE # 1, 10/4/12). The

complaint was filed pursuant to the Social Security Act, 42 U.S.C. §405(g), and is

properly before the Court for judicial review of a final decision of the Commissioner of

the Social Security Administration (hereinafter "SSA").

## FACTS

The plaintiff was born on September 18, 1958 in Cuba. (Tr. 50, 300). She

completed a fourth grade education in Cuba and moved to the United States in 1979.

---

[3] All references to the transcript of the Social Security Administration record will be cited as "Tr." See Defendant's Notice of Filing Transcript (DE # 12, 12/18/12). Moreover, the page numbers will refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the Court's CM/ECF system or any other page numbers that may appear on the document.

(Tr. 51). The plaintiff's past relevant work included working in a family-owned window blind factory where she assembled blinds, prepared invoices, received payments, interacted with customers and paid the bills for the business. (Tr. 51-54).

## 1. Treating Physicians

### a. Miguel A. Perez, M.D.

On May 8, 2008, the plaintiff began treatment with Miguel A. Perez, M.D. (hereinafter "Dr. Perez"), a psychiatrist, for depression and anxiety. (Tr. 272). She reported mood swings, flight of ideas, impulsiveness and arguments with family members. Id. Dr. Perez noted that the plaintiff appeared well groomed, with normal psychomotor activity, was cooperative and coherent. (Tr. 274). He also noted that the plaintiff appeared depressed and anxious with congruent affect. Id. The plaintiff denied suicidal and homicidal ideation or thoughts. Id. On this first visit, the plaintiff also denied hallucinations or responses to internal stimuli and obsessions. (Tr. 274-275). The plaintiff did report grandiose delusions and Dr. Perez noted that the plaintiff's insight and judgment were fair and that she was able to take care of herself. (Tr. 275). Dr. Perez diagnosed the plaintiff with bipolar disorder (mixed type) and major depressive disorder (recurrent). Id. He assigned the plaintiff a global assessment of functioning ("GAF") score[4] of 50.[5]

_____

[4] As summarized by one court:

A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994), p. 30. The GAF score is taken from the GAF scale which "is to be rated with respect only to psychological, social, and occupational functioning." Id. The GAF [s]cale ranges from 100 (superior functioning) to 1 (persistent danger of

The plaintiff continued to see Dr. Perez on an almost monthly basis from June 12, 2008 through April 18, 2009 for a total of eight additional visits. During this time, Dr. Perez assigned the plaintiff GAF scores between 50 and 55. (Tr. 335-342, 350-351).[6] On most visits, Dr. Perez reported the plaintiff's mood as depressed with congruent affect or depressed and anxious with congruent affect. Id. On one occasion, Dr. Perez reported that the plaintiff's mood was euthymic.[7] (Tr. 347). On four occasions, the plaintiff reported persecutory delusions (Tr. 351, 348, 342, 336) and on two occasions, the plaintiff reported auditory hallucinations. (Tr. 339, 351). At all other times during this period, the plaintiff denied hallucinations. (Tr. 345, 348, 354, 357). There were no instances where the plaintiff reported suicidal or homicidal thoughts or ideation and at all times the plaintiff was able to care for herself. (Tr. 335-342, 350-351). The plaintiff's insight and judgment varied between good, fair and poor, with the majority of the time being reported as fair. (Tr. 335-342, 350-351).

---

severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death). Id. Sanders v. Astrue, No. CIV-10-616-L., 2011 WL 3207367, at *3 n.1 (W.D. Okla. Jun. 30, 2011) (report and recommendation), adopted, 2011 WL 3207140 (W.D. Okla. Jul. 28, 2011).

[5] "GAF scores between 51 and 60 reflect moderate symptoms, including moderate difficulty in social, occupational, or school settings." Wind v. Barnhart, 133 F. App'x 684, 687 n.1 (11th Cir. 2005) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 2000), p. 34).

[6] GAF scores were not available for some of these visits.

[7] "'Euthymic' is defined as '[r]elating to, or characterized, by euthymia,' and 'euthymia' means '[m]oderation of mood, not manic or depressed.'" Mayberry v. Astrue, 461 F. App'x 705, 710 n.2 (10th Cir. 2012) (quoting Stedman's Medical Dictionary 627 (27th ed. 2000)).

### b.    Enrique C. Fernandez, M.D.

On four separate occasions between August 1, 2008 and October 30, 2008,[8] the plaintiff sought treatment from Enrique C. Fernandez, M.D. (hereinafter "Dr. Fernandez") (Tr. 276-86). Dr. Fernandez was the plaintiff's primary care physician. (Tr. 235).

On August 1, 2008, the plaintiff sought treatment from Dr. Fernandez for frequent headaches. (Tr. 278). Under "assessment," Dr. Fernandez noted depression and anxiety syndrome (tense or nervous) and under "plan," Dr. Fernandez recommended that the plaintiff follow up with a "psych. when scheduled." (Tr. 278). Under "prescriptions and medication changes," Dr. Fernandez listed Clonazepam 2 m.g. once daily for 30 days and Sertaline 150 m.g. once daily for 30 days. Id. Clonazepam is used to treat panic disorder and anxiety and Sertaline is used to treat depression, anxiety and other disorders.

On August 29, 2008, the plaintiff sought treatment from Dr. Fernandez for hypertension. (Tr. 280). Dr. Fernandez' report noted: "[i]ncreased frequency of smoking, more anxious. Hasn't gone back to work for several months. Refers to be [sic] very depressed, anhedonia [inability to experience pleasure] and poor interest in going out or interacting with family/friends." Id. The plaintiff's assessment continued to include depression and anxiety syndrome (tense or nervous) and her dosage of Clonazepam

---

[8] The record also contains a visit to Dr. Fernandez on March 17, 2008, before the plaintiff's alleged onset date of June 10, 2008. (Tr. 276-277). During this visit, Dr. Fernandez noted that the plaintiff appeared "[v]ery depressed, tearful." (Tr. 276). Under both "active problems" and "assessment," Dr. Fernandez listed depression and anxiety syndrome (tense or nervous). (Tr. 276-277). Dr. Fernandez recommended that the plaintiff start Wellbutrin SR 150 m.g. (an antidepressant) twice a day and that she arrange for a follow up visit with a psychiatrist. (Tr. 277).

and Sertaline remained the same. Id. Among Dr. Fernandez' recommendations was that the plaintiff consult with her psychiatrist the following week. Id.

There were no remarkable entries during the plaintiff's October 9, 2008 visit with Dr. Fernandez other than the continued assessment of depression and anxiety syndrome (tense or nervous) and that Dr. Fernandez decreased the dosage of Clonazepam (from 2 m.g. to 1 m.g.) and Sertaline (from 150 m.g. to 100 m.g.). (Tr. 282).

The plaintiff's last visit with Dr. Fernandez took place on October 30, 2008.  Dr. Fernandez reported "mild improvement in [the plaintiff's] spirits" and noted that she was "[m]ore talkative and [showed] improved attention." (Tr. 284). Dr. Fernandez continued to list depression and anxiety syndrome (tense or nervous) under "assessment" and the plaintiff's prescription for Clonazepam and Sertaline remained the same. (Tr. 284).[9]

### c.    Fernando Mendez Villamil, M.D.

The plaintiff was treated by Fernando Mendez Villamil, M.D. (hereinafter "Dr. Villamil"), a psychiatrist, on two occasions, April 22, 2009 and July 15, 2009.[10] (Tr. 367-68). The stated purpose of both visits was medication management. Id. On both

---

[9] The Commissioner notes that "Dr. Fernandez repeatedly found Plaintiff to have no abnormality to her insight, judgment, orientation, memory, mood, or affect." Defendant's Motion for Summary Judgment (DE # 24 at 4, 12, 4/22/13) (citing (Tr. 278, 280, 282, 284)). However, Dr. Fernandez diagnosed the plaintiff with depression and anxiety syndrome (tense or nervous). He was also the doctor who placed the plaintiff on antidepressant medication and recommended on multiple occasions that she follow up with a psychiatrist. See supra.

[10] The date on Dr. Villamil's progress note (Tr. 367) is difficult to read. It is unclear from this document whether Dr. Villamil saw the plaintiff on July 15, 2009 or July 25, 2009. The ALJ refers to this date as July 25, 2009 (Tr. 35) and the plaintiff refers to it as July 15, 2009. See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 7 n.6, 3/22/13) (stating that the plaintiff last saw Dr. Villamil on July 15, 2009). In ruling on the instant motion, the date of this visit is not determinative.

occasions, Dr. Villamil noted that the plaintiff appeared disheveled, showed retarded psychomotor activity and exhibited a depressed/anxious mood with a constricted affect. Id. The plaintiff exhibited impaired concentration, monotone speech, poor immediate/recent memory and concrete abstraction, but she remained alert. Id. She demonstrated impoverished and thought blocking process, but she maintained a cooperative attitude. Id. The plaintiff reported no suicidal or homicidal thought content and no obsessions or compulsions. Id. The plaintiff reported auditory hallucinations on both visits and somatic delusions on the July 15, 2009 visit. Id. Dr. Villamil assigned the plaintiff a GAF score of 46[11] on both visits. Id. During the April 22, 2009 visit, Dr. Villamil noted that the plaintiff was unable to cope with stressors. (Tr. 368). Dr. Villamil determined that the plaintiff had good insight and judgment and that she remained able to care for herself. (Tr. 367-68).

### d.   Bernardo Garcia-Granda, M.D.

The plaintiff next saw Bernardo Garcia-Granda, M.D. (hereinafter "Dr. Garcia-Granda"),[12] a psychiatrist, on approximately thirteen occasions between November 24, 2009 and August 6, 2010. (Tr. 370-79, 388-92). Dr. Garcia-Granda assessed the plaintiff with GAF scores ranging from 35 to 55, with a GAF score of 55 on her last three visits. (Tr. 370-77, 379, 388-91).

During the initial visit, Dr. Garcia-Granda reported that the plaintiff used to work

---

[11] "A GAF [score] 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), OR serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job)." Hurley v. Barnhart, 385 F. Supp. 2d 1245, 1262 n.5 (M.D. Fla. 2005) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994), p. 32).

[12] The record at times refers to Dr. Garcia-Granda as "Dr. Granda."

7

at her husband's business, but she was irritable with customers. (Tr. 378). The plaintiff told Dr. Garcia-Granda that she did not feel well, had poor appetite and did not want to go out. Id. She also recounted childhood traumas, crying and panic attacks. Id. Dr. Garcia-Granda reported that the plaintiff's mood was depressed, but noted no signs of hallucinations or delusion. (Tr. 379). He diagnosed the plaintiff with bipolar II disorder. Id. During this initial visit, Dr. Garcia-Granda assessed the plaintiff a GAF score of 40. Id.

The plaintiff next saw Dr. Garcia-Granda on December 7, 2009. (Tr. 377). During this visit the plaintiff reported feeling better. Id. There was no change to the plaintiff's GAF score. Id. Dr. Garcia-Granda increased the plaintiff's GAF score to 50 on the following visit on December 18, 2009. (Tr. 376). During this visit, the plaintiff reported to Dr. Garcia-Granda that she felt better and that everyone said she had changed and acted differently. (Tr. 376).

However, during a follow up visit on January 15, 2010, the plaintiff reported feeling worse. (Tr. 375). Dr. Garcia-Granda noted that the plaintiff had a relapse which was attributed to the use of generic medication in lieu of Seroquel, an antipsychotic medication. Id. Dr. Garcia-Granda noted that the plaintiff was "doing bad, more crisis, not sleeping, feeling depressed again" and decreased the plaintiff's GAF score from 50 to 35. Id. Dr. Garcia-Granda reported that the plaintiff had a labile affect and dysphoric mood, meaning rapid and dramatic shifts in her emotions and an unhappy mood. Id.

The plaintiff next visited Dr. Garcia-Granda on February 26, 2010. (Tr. 374). The plaintiff reported crying, feeling depressed and helpless. Id.  Dr. Garcia-Granda noted that the plaintiff was "obviously depressed" and was responding poorly to medication.

Id. He reported the plaintiff's mood as depressed with blunted affect. Id. The plaintiff's GAF score remained at 35. Id.

The plaintiff saw Dr. Garcia-Granda on March 5, 12 and 19, 2010 and on April 16, 2010. (Tr. 370-373). On all four occasions, the plaintiff reported feeling better, although on March 12 and April 16, 2010, the plaintiff reported outbursts of agitation. (Tr. 370-371).  Dr. Garcia-Granda assessed a GAF score of 40 during these visits. (Tr. 370-373).

On May 12, 2010, Dr. Garcia-Granda completed an interrogatory (mental RFC)[13] for the plaintiff's counsel. (Tr. 381-386). Dr. Garcia-Granda's diagnosis of the plaintiff was bipolar II disorder. (Tr. 381). Dr. Garcia-Granda explained that "bipolar disorder . . . affects . . . the ability to stay focused, attention, concentration on tasks, ideas" and "[p]revents [the] patient from focusing on tasks for no more than a short period of time." (Tr. 385).

Dr. Garcia-Granda found marked impairment in the plaintiff's ability to: (1) relate to co-workers, (2) deal with the public, (3) interact with supervisors, (4) respond appropriately to work pressures in a usual work setting, (5) sustain concentration to perform a task and (6) sustain attention to perform a task. (Tr. 384). Dr. Garcia-Granda also found marked impairment in the plaintiff's ability to: (1) carry out detailed instructions and (2) complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 384). The interrogatory defined

---

[13] The acronym "RFC" stands for "residual functional capacity," discussed infra.

"marked impairment" to mean that the "[a]bility to function is seriously limited and seriously interferes with the ability to perform the activity independently, appropriately, effectively and on a sustained basis. The activity can be performed from rarely to occasionally in an 8 hour work-day." (Tr. 382).

Dr. Garcia-Granda found a moderate impairment in the plaintiff's ability to: (1) follow work rules; (2) make judgments on simple work related decisions and (3) independently perform routine repetitive tasks. (Tr. 383).  Dr. Garcia-Granda also found a moderate impairment in the plaintiff's ability to understand and remember detailed instructions. (Tr. 384). The interrogatory defined "moderate impairment" to mean that the "[a]bility to function in this area is somewhat limited and unsatisfactory. The activity can be performed occasionally to frequently in an 8 hour work-day." (Tr. 382).

Dr. Garcia-Granda also found a mild impairment in the plaintiff's ability to understand, remember and carry-out short, simple instructions.  (Tr. 384). The interrogatory defined "mild impairment" to mean that the "[a]bility to function in this area is only minimally limited. The activity can be performed continuously in an 8 hour work-day." (Tr. 382).

Dr. Garcia-Granda noted that the plaintiff's "condition caused mood swings, depression, irritability [and] crying spells" which "interfere with [her] ability to interact/relate to co-workers, supervisors, and other people in general." (Tr. 384). He further noted that the plaintiff "can have relapses of her condition with severe deterioration of mood and thinking processes." (Tr. 286). Dr. Garcia-Granda's opinions were based on his own experience and background, his direct observation/treatment of the plaintiff, a review of historical medical records, patient reporting, function testing,

10

physiological/psychiatric evaluation and counseling/therapy records. (Tr. 382).

The plaintiff next saw Dr. Garcia-Granda on May 14, 2010. (Tr. 391). During this visit, the plaintiff reported that she felt better with medication. Id. Dr. Garcia-Granda noted an improvement in the plaintiff's mood with less frequent episodes of irritability and increased the plaintiff's GAF score to 45. Id.

During the plaintiff's last three visits on June 11, 2010, July 9, 2010 and August 6, 2010, Dr. Garcia-Granda assessed the plaintiff an increased GAF score of 55. (Tr. 388-390). During the June visit, the plaintiff reported doing well on medication, but was no longer sleeping as well and had occasional outbursts. (Tr. 390). Dr. Garcia-Granda increased the plaintiff's Seroquel dosage. Id. During the July visit, the plaintiff reported doing better, but having a bad week where she fought "with everyone." (Tr. 389). Dr. Garcia-Granda noted that the plaintiff had a hypomanic episode,[14] but was now stable. Id. On her final visit, the plaintiff reported doing "OK" on medication with only occasional episodes of agitation. (Tr. 388). Dr. Garcia-Granda noted gradual improvement with medication.

## 2.    Consultative Examination

On October 21, 2008, the plaintiff underwent a consultative examination by a licensed clinical psychologist, Ivan Danger, Ph.D. (hereinafter "Dr. Danger"). (Tr. 300-01).  Dr. Danger conducted a general clinical evaluation with mental status. (Tr. 300). At

---

[14] "Hypomania is characterized in part by episodes of elevated, expansive, or irritable mood lasting four or more days but is 'not severe enough to cause marked impairment in social or occupational functioning or to require hospitalization.'" United States v. Diehl-Armstrong, 504 F. App'x 152, 155 n.7 (3d Cir. 2012) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 2000), p. 365-66).

the time of her examination, the plaintiff reported being out of work for the past five months. Id. She reported to Dr. Danger that she could not remain employed in her husband's business because of her anxiety and depression. Id. The plaintiff also reported mood swings. Id.

Dr. Danger noted that the plaintiff drove herself to the examination, that she had good verbal skills in Spanish and "very limited knowledge of the English language." (Tr. 300). Dr. Danger reported that the plaintiff complained of anxiety, depression, lack of appetite and inability to sleep. Id. He noted the plaintiff's depression appeared to be long standing. Id. He further stated that "[a]n elevated degree of depression was noted, crying throughout the session, looking down [at] the floor, projecting concerns, and lack of ability to concentrate with the consequences of loss memory." (Tr. 300-301). He noted that while the plaintiff's long term memory was acceptable, her recent memory was poor. (Tr. 301). He also noted the plaintiff's mood was depressed with anxiety. Id. Dr. Danger diagnosed the plaintiff with depressive disorder not otherwise specified and adjustment disorder with anxiety. Id. He assigned her a GAF score of 65.[15] Id.  In the comments section, Dr. Danger wrote the following:

> [The plaintiff] was observed to be an alert and oriented individual, with noticeable degree of depression in conjunction with anxiety, as she described her depression as being of long standing. At present time[ ] she is able to manage funds, although this activity should be supervised. Her social skills are directly affected by her emotional and social conditions. Continuations of the present medical and psychiatric treatments are strongly recommended.

Id.

----

[15] A GAF "score of 61-70 indicates a patient with mild symptoms." Richards v. Astrue, 370 F. App'x 727, 729 n.1 (7th Cir. 2010) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994), p. 32).

3.      **Non-Examining State Agency Consultants**

a.      **Mercedes DeCubas, Ph.D.**

On December 8, 2008, Mercedes DeCubas, Ph.D. (hereinafter "Dr. DeCubas"), a state agency psychologist, completed a Mental Residual Functional Capacity Assessment of the plaintiff. (Tr. 302-319). Dr. DeCubas determined that the plaintiff had no restrictions to her activities of daily living; mild difficulties in maintaining social functioning, concentration, persistence, or pace and no episodes of decompensation. (Tr. 306-19). She noted that the plaintiff was able to understand, remember and carry-out simple instructions, was capable of performing simple tasks and was able to sustain goal directed activities moderately well (but at a slower pace) and timed work/quotas were "not good." (Tr. 304). She described the plaintiff's social skills as adequate. Id. She further determined that the plaintiff needed a setting with few changes to avoid frustration and undue stress. Id. The plaintiff also had the ability to function in a routine setting, though she might need assistance in developing realistic plans. Id. Dr. DeCubas also stated that continued psychiatric treatment/counseling would be helpful. Id.

b.      **Cheryl Woodson, Psy.D.**

Another state agency psychologist, Cheryl Woodson, Psy.D. (hereinafter "Dr. Woodson"), completed a Psychiatric Review Technique of the plaintiff on February 4, 2009. (Tr. 320-333). Dr. Woodson noted that the plaintiff had a mild restriction to her activities of daily living, mild difficulties in maintaining social functioning, concentration, persistence or pace and no episodes of decompensation. (Tr. 330).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 416(i); 423(d)(1); 20 C.F.R. § 404.1505. The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. §§ 404.1505-1511.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. §§ 404.1520(a)-(f). The ALJ must first determine whether the plaintiff is presently employed or engaged in substantial gainful activity. If so, a finding of non-disability is made and the inquiry ends.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. If the plaintiff does not, then a finding of non-disability is made and the inquiry ends.

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520(d), Subpart P, Appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the plaintiff's ability to perform other work. See Gibson v. Heckler, 762 F.2d 1516, 1518 n.1 (11th  Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

14

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" (hereinafter "RFC") to perform his or her past relevant work. RFC is defined as "what you can do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination takes into account "all relevant evidence," including medical evidence, the plaintiff's own testimony and the observations of others. If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e); see also Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991) (noting that the claimant bears the initial burden of proving that he is unable to perform previous work).

Fifth, if the plaintiff cannot perform his or her past relevant work, the ALJ must decide if the plaintiff is capable of performing any other work in the national economy.

## THE ALJ'S FINDINGS

On November 22, 2010, the ALJ issued her decision (Tr. 28-40) finding that the plaintiff was not disabled under the relevant sections of the Social Security Act.

At step one, the ALJ determined that the plaintiff was not engaged in substantial gainful activity since June 10, 2008, the alleged onset date of her disability. (Tr. 30). Specifically, the ALJ found that while the plaintiff did work after June 10, 2008, her level of work activity did not rise to the level of substantial gainful activity. Id. This allowed the ALJ to move to step two to determine whether the plaintiff had a severe impairment or combination of impairments. The ALJ found that the plaintiff had bipolar disorder which was a "severe impairment" as defined in the regulations at 20 C.F.R. § 414.1520(c). Id.

15

At step three, the ALJ found that the plaintiff's mental impairment of bipolar disorder did not meet or equal the severity of one of the listed impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520 (d), Subpart P, Appendix I. (Tr. 30-32).

At step four, the ALJ found that the plaintiff had the RFC to perform semi-skilled and unskilled work as defined by the regulations, limited to jobs requiring occasional interaction with the public and that do not require assembly (quota-type) pace. (Tr. 32). Specifically, the ALJ found, based on VE testimony, that the plaintiff had the RFC to perform her past relevant work as a blind assembler and sewing machine operator. (Tr. 39).

Alternatively, even if the plaintiff could not perform her past relevant work, the ALJ found, at step five, that there were jobs that existed in significant numbers in the national and local economy which the plaintiff could perform, including working as a Venetian blind cutter, stock checker and mold sheet cleaner as defined by the Dictionary of Occupational Titles. (Tr. 39). For these reasons, the ALJ found that the plaintiff was not disabled under the Social Security Act. (Tr. 40).

## STANDARD OF REVIEW

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); see also Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute its discretion).  On judicial review, decisions made by the defendant, the Commissioner of Social Security, are conclusive if supported by

substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g) (2006); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999). Substantial evidence is more than a scintilla, but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Substantial evidence is relevant evidence a reasonable person would accept as adequate to support the ALJ's conclusion. Richardson, 402 U.S. at 401. In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).

This restrictive standard of review, however, applies only to findings of fact.  No presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. See Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (stating that the "Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"); accord Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. See Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide facts anew, re-weigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); see also Baker v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is

presumed valid, but the legal standard applied is not. See Martin, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. Id.

## LEGAL ANALYSIS

The plaintiff faults the ALJ's decision on three grounds:[16] (1) the ALJ improperly relied on the plaintiff's son's ambiguous testimony to conclude that the plaintiff worked after her alleged onset date, but failed to report income and used this ambiguous testimony to negatively impinge on the plaintiff's credibility; (2) the ALJ erred in assessing an RFC where the plaintiff was capable of tolerating the mental demands of semi-skilled work and skilled work and limited to jobs requiring only occasional interaction with the public and not requiring assembly (quota type) pace and (3) the VE's testimony that the plaintiff could return to her past relevant work is inconsistent with the Commissioner's Policy. See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 17, 20-24, 3/22/13). The Court will address these arguments in turn.

## 1.    The Plaintiff's Son's Testimony

At the outset, the plaintiff does not dispute the ALJ's finding at step one that the plaintiff has not engaged in substantial gainful activity since June 10, 2008, the alleged

---

[16] The plaintiff also argues that "[t]wo psychiatrists who treated [the plaintiff] during the period at issue opined she was too limited to work." Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 17, 20-24, 3/22/13). However, and as the Commissioner correctly points out, other than Dr. Garcia-Granda, no treating physician offered a disability or residual functional capacity opinion. The plaintiff's criticisms of the ALJ's treatment of Dr. Garcia-Granda's opinions are addressed below.

onset date of her disability. (Tr. 28, 30). In reaching this conclusion, however, the ALJ

stated:

> At the hearing held on September 25, 2010[17] the claimant's son, Jelanis
> Flores, who is also employed with the family-owned and operated
> business, testified credibly that his mother continued to worked as a
> secretary in the family owned business until June 2010. According to Mr.
> Flores, starting in January, 2010, the business down-sized because of the
> downturn in the economy, not because of his mother's health. Starting in
> June 2010, the family stopped the claimant from going into work because
> she had too much contact with the clientele. The claimant, however,
> reported no income was [sic] for 2009-2010.

 (Tr. 30) (footnote added). The plaintiff disputes the factual finding that the plaintiff

worked after June 10, 2008, but did not report any income for the years 2009-2010.

Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at

17, 3/22/13). Because this factual finding was later used by the ALJ to ascertain the

plaintiff's credibility (Tr. 34)[18] in determining the plaintiff's RFC, the Court will address

the plaintiff's objection.

The ALJ's finding is based on the following testimony from Mr. Flores:

Q    When did your mother stop working -- well, has your mother
     continued to work in the business?

A    No.

**Q    When did she stop?**

---

[17] This date appears to be a typographical error. The transcript of the administrative
hearing states that it took place on September 13, 2010. (Tr. 47).

[18] At step four, the ALJ determined the plaintiff's RFC. In her analysis, the ALJ stated
that the plaintiff's son, Mr. Flores, testified that: "his mother stopped working at the business in
June or July of this year [2010]" and that "[i]n June 2010, they stopped sending the claimant to
work because she had too much contact with the clients." (Tr. 34). The ALJ then concluded,
based in part on Mr. Flores' testimony, that "the claimant gave inconsistent information
regarding work since the alleged onset date . . . ." Id. For the reasons stated below, the Court
concludes that Mr. Flores' testimony concerning when his mother stopped working is
ambiguous.

A       **Around, I'd say June, July.**

Q       **Of?**

A       I think it was -- I believe (INAUDIBLE] was – [INAUDIBLE]?

Q       This is 2010.

A       Yeah, **I believe she hasn't -- I have not seen my mom at work in a very long time.**

Q       And did she stop working in the business? You say June or July, when?

A       **June. The exact date I'm not sure. We tired [sic] to get her in several occasions. But it just wasn't working.**

Q       **Which year?**

A       **That was this year.**

(Tr. 62-63) (emphasis added).

The Commissioner refers to the above testimony as "unambiguous." Defendant's Motion for Summary Judgment (DE # 24 at 10, 4/22/13). The Court disagrees with this characterization of Mr. Flores' testimony. It is unclear from Mr. Flores' statement, "That was this year," whether he meant that was the last time his mother worked or whether that statement refers to when they last "t[ri]ed to get her in . . . . But it just wasn't working." (Tr. 63). It is impossible to ascertain from this transcript the meaning of Mr. Flores' statement "That was this year" without any follow up questions to clarify Mr. Flores' testimony. Moreover, Mr. Flores also testified that he "ha[d] not seen [his] mom at work in a very long time." Id. It is unlikely that "a very long time" meant three months[19]

_____

[19] According to the ALJ, Mr. Flores testified that his mother continued to work in the business until June 2010. (Tr. 30). Mr. Flores testified on September 13, 2010, approximately three months after his mother purportedly stopped working at the business.

20

before the hearing. In any event, the Court finds that Mr. Flores' testimony is ambiguous on this issue and the ALJ failed to clarify Mr. Flores' testimony at the administrative hearing. "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record. This obligation exists even if the claimant is represented by counsel . . . ." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

As noted earlier, the Commissioner's factual findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "more than a scintilla, but less than a preponderance." Richardson, 402 U.S. at 401. Here, Mr. Flores' testimony is ambiguous and does not support the ALJ's conclusion that the plaintiff worked in 2009 and 2010, but did not report any income for those years. Because there is no other record evidence[20] to support the ALJ's factual finding that the plaintiff worked in 2009 and 2010, the Court agrees with the plaintiff that this factual finding is not supported by substantial evidence.

The ALJ relied on Mr. Flores' testimony to: (1) find that the plaintiff worked in 2009 and 2010 and (2) assess the plaintiff's credibility. (Tr. 30, 34). The ALJ's reliance on Mr. Flores' testimony to ascertain when the plaintiff stopped working is insufficient to support reversal. As noted above, the plaintiff does not dispute the ALJ's ultimate conclusion at step one that the plaintiff has not engaged in substantial gainful activity since June 10, 2008, the alleged onset date of her disability. (Tr. 28, 30). The ALJ's

_____

[20] The Commissioner points out that the plaintiff's testimony at the September 13, 2010 evidentiary hearing did fluctuate "on varying occasions that it was May, June, or August 2008" that she last worked. See Defendant's Motion for Summary Judgment (DE # 24 at 9, 4/22/13). However, there is no evidence to support the ALJ's conclusion that the plaintiff worked in 2009 and 2010, other than Mr. Flores' ambiguous testimony.

reliance on Mr. Flores' testimony to impinge on the plaintiff's credibility will be addressed below.

## 2.   Whether the ALJ's RFC Determination Was Supported by Substantial Evidence

Next, the plaintiff disputes the ALJ's finding that the plaintiff "had the RFC to return to her past work as blind assembler and sewing machine operator" and her alternative finding that "based on an RFC where she could tolerate the mental demands of at least semi-skilled work with only occasional interaction with the public, and no production type pace, assembly line type work, and her age, education, past work experience and existence of transferable skills, . . . [the plaintiff] could perform other work and was therefore not disabled." Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 19-20, 3/22/13).

The plaintiff argues that the RFC assigned to her in the instant case was erroneous because the ALJ: (a) discounted Dr. Garcia-Granda's opinion on marked limitations in vocationally significant areas by applying a "distorted view" of the GAF scores and omitting much of Dr. Garcia-Granda's notations on psychopathology and, as such, did not show good cause for discounting Dr. Garcia-Granda's medical assessment; (b) ignored and/or "distorted" the treatment notes of Dr. Perez and Dr. Villamil and incorrectly stated that there was a gap in the plaintiff's medical treatment where there was none and (c) attacked the plaintiff's credibility concerning when she stopped working and her understanding of the English language without substantial evidence. See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 20-21, 3/22/13).

22

### (a)        Dr. Garcia-Granda's Medical Opinions

"In determining whether a disability exists, the ALJ must give the opinion of [a]

treating physician 'substantial or considerable weight unless 'good cause' is shown to

the contrary.'" Gainous v. Astrue, 402 F. App'x. 472, 474 (11th Cir. 2010) (quoting

Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (footnote omitted). "'Good

cause' [to discount a treating physician] exists where (1) the treating physician's opinion

was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3)

the treating physician's opinion was conclusory or inconsistent with his own medical

records." Good v. Astrue, 240 F. App'x. 399, 403 (11th Cir. 2007) (quoting MacGregor

v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)).

Here, the ALJ discredited Dr. Garcia-Granda's low GAF scores as follows:

At this juncture, I must comment on the fact that Dr. Granda had provided
a [GAF] rating of 40[21] to the claimant during her medical examinations. **I
give very little if any weight to these GAF scores because they are
totally inconsistent with his own clinical notes and mental status
examinations which consistently document the contrary,** as
discussed above. Basically, **Dr. Granda's own records show that
following appropriate treatment, the claimant's mental condition (as
reported by herself) and as observed and documented by Dr. Granda
in his clinical findings, significantly improved**. There was no
impairment in reality testing, no impairment in judgment or thinking, no
evidence of hallucinations, delusions or homicidal or suicidal ideations.

A rating of 40 according to the DSM-IV page 32 is indicative of impairment
in reality testing or communication, speech is illogical, obscure or
irrelevant and impairment in judgment thinking or mood. At no time during
the multiple occasions, that the claimant was examined by Dr. Granda
were any of these symptoms reported or documented . . . .

(Tr. 37) (footnote in original) (emphasis added).

---

[21] Pursuant to the DSMV-IV, a GAF of 40 is significant for some impairment in reality
testing or communication. As is evidenced from the repeated mental status examinations, the
clinical notes do not document any such impairment.

The plaintiff argues that:

> both the DSM-IV and SSA mental listings contemplate situations where the assigned GAF score is discordant with the individual's symptom severity or psychopathology. For example, the DSM-IV states: "It should be noted that in situations where the individual's symptom severity and level of functioning is discordant, the final GAF rating always reflects the worse of the two. For example, the GAF rating for an individual with minimal psychological symptomatology but significant impairment in functioning (e.g., an individual whose excessive preoccupation with substance use has resulted in loss of a job and friends but no other psychopathology) would be 40 or lower. DSM-IV, p. 32-33. <u>See</u> <u>also</u> subsection E of section 12.00, preamble to mental disorders (Stating that in cases of chronic affective disorders, controlled signs and symptoms don't necessarily correlate with better functioning and [an] individual may be much more limited that what would be suggested by signs and symptoms alone).

Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at

6-7 n.8, 3/22/13). The plaintiff further points out that:

> Dr. Granda had noted that [the plaintiff] cried all the time and had panic attacks, had many childhood traumas, had experienced a loss in her family, didn't want to go out, had poor appetite, was no longer working and had issues with customers at work. His GAF score of 40 reflected his assessment of how poorly [the plaintiff] was functioning, not the seriousness of her psychopathology. Accordingly, the ALJ's emphasis on [the plaintiff's] minimal signs and her conclusion that these minimal signs were "totally inconsistent" with the GAF score of 40 is erroneous because it wrongly assumes that GAF scores relate only to psychopathology (e.g. the severity of signs and symptoms) when in fact it relates to **either** the signs and symptoms **or** the level of functioning of the individual as assessed by the clinician.

<u>Id.</u> (emphasis in original).

The Commissioner responds that: "GAF scores are not dispositive evidence of

disability" and that "Dr. Garcia-Granda's assigned GAF scores of 40 conflicted with the

other evidence of record, including" Dr. Garcia-Granda's notes "routinely f[inding] [the

p]laintiff to be oriented and to have fair or good insight and judgment," the plaintiff's

continued denials of "delusions, hallucinations, and suicidal/homicidal ideation," her well

kempt appearance and "fair or good fund of knowledge and/or good memory and her

"consistent[ ] improve[ment] once she began treating with Dr. Garcia-Granda."

Defendant's Motion for Summary Judgment (DE # 24 at 11, 4/22/13) (citations to the

record omitted). The Commissioner also notes that another physician, Dr. Perez,

"routinely observed [the p]laintiff to be well groomed, with normal psychomotor activity

and a cooperative attitude," the plaintiff "repeatedly denied any suicidal or homicidal

ideation, obsessions, or compulsions" and "had a goal-directed thought process." Id. at

11-12. The Commissioner further states that the plaintiff's treating physicians "routinely

determined that [she] remained able to care for herself" and that "Dr. Fernandez

repeatedly found [the p]laintiff to have no abnormality to her insight, judgment,

orientation, memory, mood, or affect." Id. at 12.

> As this Court has explained:
>
> The GAF scale is divided into ten ranges. The GAF rating reflects the individual's overall level of functioning at the time of the examination. **The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range.** When the individual's symptom severity and functioning level are discordant, t**he GAF rating reflects the worse of the two.** Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health.

Eubanks-Glades v. Colvin, No. 13-60029-CIV, 2013 WL 6116810, at *3 n.4 (S.D. Fla.

Nov. 20, 2013) (order adopting report and recommendation) (citing Am. Psychiatric

Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 2000),

p. 34) (emphasis added).

"Courts in this district have . . . recognized that GAF scores are of questionable value in determining an individual's mental functional capacity" and "have generally declined to find reversible error where an ALJ does not expressly discuss a claimant's GAF scores." Cranford v. Comm'r of Soc. Sec., No. 6:13-cv-415-Orl-GJK, 2014 WL 1017972, at *7 (M.D. Fla. Mar. 17, 2014) (citation and internal quotation marks omitted). As the Eleventh Circuit has noted, "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

Here, the ALJ gave "very little if any weight" to Dr. Garcia-Granda's GAF scores because Dr. Garcia-Granda's medical records show "no impairment in reality testing, no impairment in judgment or thinking, no evidence of hallucinations, delusions or homicidal or suicidal ideations." (Tr. 37). However, and as the plaintiff points out, the low GAF scores could have been attributed to the plaintiff's social and occupational functioning and thus, her lack of psychiatric symptom severity should not have been used to discredit the GAF scores. There is no indication that the ALJ took into account the plaintiff's level of functioning (as opposed to the severity of her symptoms of psychopathology) in determining that the GAF scores assigned by Dr. Garcia-Granda were "totally inconsistent with his own clinical notes and mental status examinations." (Tr. 37). Of note, Dr. Garcia-Granda assigned the plaintiff GAF scores ranging from 35 to 55. Dr. Perez' GAF scores ranged from 50 to 55 and Dr. Villamil's GAF scores were

46. Thus, Dr. Garcia-Granda's GAF scores were within the range assigned by her two other treating psychiatrists.

Moreover, as Dr. Garcia-Granda noted in his response to the medical interrogatory, the plaintiff's "condition caused mood swings, depression, irritability [and] crying spells" which "interfere with [her] ability to interact/relate to co-workers, supervisors, and other people in general." (Tr. 384). He further noted that the plaintiff "can have relapses of her condition with severe deterioration of mood and thinking processes." (Tr. 286). These symptoms and an episode of relapse were recorded in Dr. Garcia-Granda's treatment notes. See Treatment Notes (stating that plaintiff was irritable with customers, reported crying and panic attacks, Tr. 378); (noting relapse and reported crying and feelings of depression and helplessness, Tr. 374-75); (reporting outbursts of agitation, Tr. 370-371); (reporting occasional outbursts, Tr. 390); (reporting a bad week and fighting with "everyone," Tr. 389); (reporting occasional episodes of agitation, Tr. 388).

The ALJ also discredited Dr. Garcia-Granda's opinions to the extent he found "marked limitations" in the plaintiff's ability to perform certain functions because they were not supported by his clinical notes. In her decision, the ALJ stated the following:

> As to [Dr. Garcia-Granda's] assessment that the claimant had marked limitations in completing a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, marked limitations in sustaining concentration to task and sustain attention to task, **this is not supported by his clinical notes**, as discussed above and throughout this decision. The **clinical notes, including repeated mental status examinations documented that the claimant has good to fair ability in these areas . . . Further, the notes document consistent improvement in less than 12 months after he started treating the claimant, and even more significant documented improvements after**

27

**he rendered the opinion** . . . . **As such, this cannot be given controlling weight.** Except for the inconsistencies identified above, and based in part on evidence and clinical notes not considered when Dr. Granda completed his medical interrogatory in May 2010, the opinion is consistent with the residual functional capacity assessed herein . . . .

(Tr. 38) (footnote and emphasis added).

The plaintiff argues that "[t]he ALJ's summary again omitted all the positive signs of psychopathology as well as the lowering of the GAF score and comments that [the plaintiff] had relapsed and was doing bad" and that it is "noteworthy that the ALJ [did not] bother to summarize [Dr. Garcia-Granda's February 26, 2010] note at all which is consistent with the skewed review of the record evidence displayed by the ALJ in this case." Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 8 n.9-10, 3/22/13).

In her decision, the ALJ stated that Dr. Garcia-Granda's "notes document consistent improvement in less than 12 months after he started treating the claimant." (Tr. 38). However, during a follow up visit to Dr. Garcia-Granda on January 15, 2010, the plaintiff reported feeling worse and Dr. Garcia-Granda noted that the plaintiff had a relapse which was attributed to the use of generic medication. (Tr. 375). Consequently, Dr. Garcia-Granda decreased the plaintiff's GAF score from 50 to 35. Id.  During the next visit on February 26, 2010, the plaintiff reported crying, feeling depressed and helpless and Dr. Garcia-Granda noted that the plaintiff was "obviously depressed" and was responding poorly to medication. (Tr. 374). He reported the plaintiff's mood as depressed with blunted affect and the plaintiff's GAF score remained at 35. Id.  Thus, while the plaintiff did ultimately improve under Dr. Garcia-Granda's care, the plaintiff's improvement was not "consistent" during this period.

28

Moreover, the ALJ appears to have misread Dr. Garcia-Granda's treatment note of January 15, 2010. The ALJ's decision summarized this note as follows:

> On January 15, 2010, the claimant advised, "I am doing very well." No mental irregularities, deficiencies or abnormalities were noted. The claimant was oriented in all three spheres, reported no delusions or hallucination, displayed good judgment and insight, good fund of knowledge, good recent, remote and immediate recall. [Dr. Garcia-Granda] prescribed a trial of a new medication . . . .

(Tr. 36). The plaintiff maintains that the January 15, 2010 note states that the plaintiff "was" doing very well (past tense). See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 7, 3/22/13) (citing Tr. 375). It is unclear from Dr. Garcia-Granda's handwriting whether the word at issue is "was" or "am." However, from reading the remainder of the treatment note it appears that the plaintiff's construction is more likely given that Dr. Garcia-Granda decreased the plaintiff's GAF score from 50 to 35 during the January 15, 2010 visit (compare Tr. 375 with Tr. 376), he noted a relapse in the plaintiff's condition and wrote "[p]atient doing bad, more crisis, not sleeping, feeling depressed again." Id. at 375. The ALJ makes no mention of the aforementioned observations in her decision.

For the reasons stated above, the Court finds that the ALJ's discounting of Dr. Garcia-Granda's medical opinions was not supported by substantial evidence and the case should be REMANDED for further administrative proceedings.

**(b)     Dr. Perez, Dr. Fernandez and Dr. Villamil's Medical Records and the Perceived Gap in Medical Treatment**

**(i).     Dr. Perez and Dr. Fernandez' Medical Records**

In her decision, the ALJ noted that "the record contains some progress notes from Drs. Enrique C. Fernandez and Miguel Angel Perez . . . documenting some **sporadic treatment for symptoms of depression in 2008**" and that "[c]areful review of Drs. Perez and Fernandez' treatment notes document conservative care for **transient and sporadic symptoms** associated with hypertension, hyperlipedemia, headaches, the flu and depression." (Tr. 34). The ALJ's characterizations of the plaintiff's treatment with Drs. Fernandez and Perez as "sporadic" and her symptoms as "transient and sporadic" are not supported by the record. Between May 8, 2008 and April 18, 2009, the plaintiff saw Dr. Perez a total of nine times and seven of those visits took place in the eight-month time span between May 2008 and December 2008. (Tr. 272-275; 335-342, 350-351). With the exception of one visit,[22] Dr. Perez consistently reported the plaintiff's mood as depressed with congruent affect or depressed and anxious with congruent affect. Id. Thus, it is unclear how the ALJ could have fairly characterized the plaintiff's consultations with Dr. Perez in 2008 as "sporadic treatment for symptoms of depression." (Tr. 34). Similarly, it is unclear how the ALJ could have characterized the plaintiff's symptoms, with respect to depression, as "transient and sporadic symptoms" when Dr. Perez on an almost consistent basis reported the plaintiff's mood as depressed with congruent affect or depressed and anxious with congruent affect. (Tr. 274, 356, 353, 350, 344, 341, 338, 335).

_____

[22] On only one occasion, Dr. Perez reported that the plaintiff's mood was euthymic. (Tr. 347).

Similarly, while the plaintiff only saw Dr. Fernandez on four occasions after her onset date of June 10, 2008,[23] those visits took place during a three month period wherein the plaintiff saw Dr. Fernandez twice in August, 2008 and twice in October, 2008. (Tr. 278-286). On each of those visits, Dr. Fernandez' assessment included depression and anxiety syndrome (tense or nervous). (Tr. 278, 280, 282, 284). On two visits, under "plan," Dr. Fernandez recommended that the plaintiff follow up with a psychiatrist. (Tr. 278, 280). Moreover, on all four visits under "prescriptions and medication changes," Dr. Fernandez consistently listed Clonazepam and Sertaline. (Tr. 278, 280, 282, 285), medications used to treat panic disorder, anxiety and depression. Thus, while Dr. Fernandez treated the plaintiff for a whole host of other problems including headaches (Tr. 278), hypertension (Tr. 280), numbness (282) and leg pain (Tr. 284), it is clear that the plaintiff's depression and/or anxiety symptoms and treatment were not "transient" or "sporadic" during the time the plaintiff treated with Dr. Fernandez.

### (ii).    Dr. Villamil's Medical Records

The plaintiff also criticizes the ALJ's summary of Dr. Villamil's medical records. The plaintiff saw Dr. Villamil on two occasions: April 22, 2009 and July 2009.[24] The ALJ summarized the April 22, 2009 visit to Dr. Villamil as follows:

> The record shows that on April 22, 2009 the claimant sought treatment with Dr. Fernando Mendez Villamil for symptoms of depression and anxiety (Exhibit 9F). On examination, the claim[ant] was cooperative and

---

[23] The plaintiff also treated with Dr. Fernandez on March 17, 2008, before her alleged onset date.

[24] As noted earlier in this Order, there is some discrepancy as to the date in July 2009 when the plaintiff visited Dr. Villamil.

31

> she had good eye contact and was alert. She denied any homicidal or
> suicidal ideation but admitted auditory hallucinations. She denied any
> obsession and her insight was deemed as good. Although her memory
> and concentration had some lapses, her orientation was intact in all
> spheres and she was deemed capable of taking care of herself. She was
> advised to return for treatment in three months . . . .

(Tr. 35).

With respect to the April 22, 2009 visit, the plaintiff argues that: "None of [the]

psychiatric signs and symptoms, all relevant and evincing an impaired individual with

serious occupational impairment, made it to the summary of the evidence in the ALJ

decision, who again appears to highlight selective portions of the record while ignoring

other contrary evidence." Memorandum of Law in Support of Motion for Judgment by

the Pleadings (DE # 20-1 at 5 n.5, 3/22/13). The signs and symptoms referred to by the

plaintiff include: "poor energy, poor interest level, poor motivation, inability to cope with

stressors, disheveled appearance, retarded psychomotor activity, anxious and

depressed mood with constricted affect, poor immediate and recent memory, impaired

concentration, impoverished thought processes with thought blocking, a GAF score of

46 and a diagnosis of schizophrenia chronic paranoid type. Id. at 5.

The plaintiff further notes that "The ALJ also incorrectly asserts Dr. Mendez

[Villamil]' records document she was not on any medication. . . . But both of his notes

indicate next to the RX symbol: see Rx copy, indicating he had prescribed medications

in a separate prescription pad or document." Memorandum of Law in Support of Motion

for Judgment by the Pleadings (DE # 20-1 at 5 n.5, 3/22/13).

The plaintiff also criticizes the ALJ's summary of the plaintiff's July 2009 visit to

Dr. Villamil along the same lines as the April 22, 2009 visit: "the ALJ omit[ted] most of

the signs and symptoms observed by Dr. Mendez [Villamil during the July 2009 visit], as

well as the low GAF score, and provide[d] . . . [a] skewed summary." Memorandum of

Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 6 n.6, 3/22/13).

The ALJ summarized the plaintiff's July 2009 visit to Dr. Villamil as follows:

> "[The plaintiff again visited Dr. Villamil (apparently for the last time) on July 25, 2009 . . . At the time, the claimant indicated she had poor energy. Again, on detailed mental examination, Dr. Villamil advised that the claimant was oriented in all spheres. She was cooperative, her eye contact was good and she was alert. Again, there were no suicidal or homicidal ideations and no obsessions or compulsions and her insight and judgment were good. She endorsed auditory hallucination. The claimant was again advised to return in three months . . . .

(Tr. 35).

The Court agrees with the plaintiff that in summarizing Dr. Villamil's medical

records, the ALJ omitted some of the relevant signs and symptoms of the plaintiff's

illness. Moreover, in summarizing the plaintiff's April 22, 2009 visit to Dr. Villamil, the

ALJ incorrectly stated: "At the time, clinical notes document that **she was not on any**

**medication and there is no indication that Dr. Mendez Villamil prescribed any** . . .

." (Tr. 35) (emphasis added). The record does not support the ALJ's recitation of the

facts. The treatment note for April 22, 2009 expressly states: "Patient has been seen

today for medication management." (Tr. 368). Moreover, under "plan," the words "RX:

See Rx Copy" were circled. Id.[25] Thus, there is no support in the record for the ALJ's

conclusion that the plaintiff was not on medication at the time she consulted with Dr.

Villamil on April 22, 2009 or that Dr. Villamil did not prescribe any medication. To the

extent there was a question concerning the medications the plaintiff was prescribed or

---

[25] Dr. Villamil's July 2009 treatment note makes the same notation concerning the purpose of the visit and prescription medication (Tr. 367), but that portion of the treatment note is not addressed in the ALJ's decision.

taking while treating with Dr. Villamil, the ALJ had the duty to develop the record. See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (stating that "[i]t is well-established that the ALJ has a basic duty to develop a full and fair record."). In any event, the ALJ should not have concluded that the plaintiff was not on medication at the time she treated with Dr. Villamil on April 22, 2009 given the statements contained in the treatment note for that day. (Tr. 368).

The Commissioner argues that "[t]he ALJ is not required to discuss every piece of evidence in her decision." Defendant's Motion for Summary Judgment (DE # 24 at 8 n.2, 4/22/13).[26] While the ALJ is not required to cite every piece of evidence, the ALJ is required to consider all the relevant evidence. See May v. Comm'r of Soc. Sec., No. 2:13-cv-323-FtM-DNF, 2014 WL 4626072, at *3 (M.D. Fla. Sept. 15, 2014) (stating that "[i]n determining whether [the p]laintiff can return to her past relevant work, the ALJ must determine the [p]laintiff's RFC using all of the relevant medical and other evidence in the record.") (citing Phillips v. Barnhart, 357 F.3d 1232, 1238-39 (11th Cir. 2004), 20 C.F.R. § 404.1520(e)). Here, the ALJ omitted relevant portions of Dr. Villamil's treatment notes without providing good cause for discrediting Dr. Villamil and incorrectly believed that the plaintiff was not on medication and that Dr. Villamil did not prescribe any medication to the plaintiff. As such, a REMAND is warranted.

### (iii).   Perceived Gap in Medical Treatment

The ALJ also stated that there was:

an obvious gap in medical treatment that spanned from the claimant's alleged onset date of June 10, 2008 until July 2009 when the claimant first

---

[26] It is unclear from the Commissioner's motion whether this argument concerns the ALJ's summary of Dr. Villamil's medical records or Dr. Garcia-Granda's medical records.

> sought more consistent on-going mental health care with Dr. Bernardo
> Garcia[-]Granda. While the record contains some progress notes from
> Drs. Enrique C. Fernandez and Miguel Angel Perez . . . documenting
> some sporadic treatment for symptoms of depression in 2008, the
> objective evidence shows that it was not until July 2009 that the claimant
> sought more formal psychiatric care with Dr. Bernardo Garcia-Granda.

(Tr. 34). On the next page of the decision, the ALJ also stated: "There are no records of

on-going mental health care with Dr. Villamil or any other mental health physician **until**

**more than a year later [o]n November 24, 2009** when Dr. Bernardo Garcia[-]Granda

initially examined the claimant . . . ." (Tr. 35) (emphasis added).

The plaintiff argues that the ALJ's statement of a gap in the medical treatment "is

clearly incorrect, as [the plaintiff] continued seeing Dr. Perez regularly from May 2008

through April 2009, and was then seen by Dr. Villamil, another psychiatrist, from April

2009 through July 2009 . . . ." Memorandum of Law in Support of Motion for Judgment

by the Pleadings (DE # 20-1 at 5 n.4, 3/22/13).

The Court agrees with the plaintiff. Here, the ALJ incorrectly assumed a gap of

over a year in the plaintiff's medical treatment. The record shows that the longest gap in

the plaintiff's medical treatment was approximately four months, between the plaintiff's

last visit to Dr. Villamil in July 2009 and the plaintiff's initial visit with Dr. Garcia-Granda

on November 24, 2009. Yet the ALJ's decision inexplicably states: "There are no

records of on-going mental health care with Dr. Villamil or any other mental health

physician **until more than a year later in November 24, 2009** when Dr. Bernardo

Garcia-Granda initially examined the claimant." (Tr. 35). Thus, the ALJ's statement of

"an obvious gap in medical treatment" is factually unsupported by the record. "The ALJ

has a duty to review the whole record . . . ." Geiger v. Apfel, No. 6:99-CV-12-ORL-18B,

2000 WL 381920, *7 (M.D. Fla. Feb. 9, 2000) (report and recommendation). Here, the ALJ's statements concerning a non-existent gap of over a year in the medical records indicate that the ALJ did not discharge that duty. The ALJ's misperception concerning the plaintiff's medical records require that the case be REMANDED for further administrative proceedings.

(c)     **The ALJ's Credibility Determination**

In her decision, the ALJ stated that: "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, **the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible** to the extent they are inconsistent with the above [RFC] assessment." (Tr. 34) (emphasis added). The plaintiff faults the ALJ's credibility assessment for two reasons: (1) it relied on the plaintiff's son's ambiguous testimony and (2) there was no basis to discredit the plaintiff's inability to communicate in English. Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 11 n.11, 21, 3/22/13).

The undersigned has already determined that Mr. Flores' ambiguous testimony does not support the ALJ's conclusion that the plaintiff worked in 2009 and 2010, but did not report her income. See discussion, supra. Thus, the undersigned agrees with the plaintiff that her son's testimony does not support the ALJ's credibility determination.

The ALJ also stated that:

There is . . . a question as to the claimant's ability to communicate in English. The claimant has lived in the United States since November

1979, is a United States Citizen and has worked in a business at jobs requiring communication with English-speaking clientele.

(Tr. 34). As the plaintiff correctly points out, there is nothing in this record to support the ALJ's conclusion that the plaintiff was required to speak to customers in English. See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 11, 3/22/13). At administrative hearing, Mr. Flores testified that the majority of the business' clients were Spanish speaking clients with the exception of two or three individuals.[27] (Tr. 64). There is no record evidence that the plaintiff had any contact with these two or three non-Spanish speaking clients. Moreover, there is record evidence in the form of the plaintiff's testimony that she took her United States citizenship exam in Spanish.[28] The plaintiff's testified at the administrative hearing through a Spanish interpreter and throughout the application process communicated in Spanish with SSA employees. There is simply no basis for the ALJ's statement that "[t]here is . . . a

_____

[27] At the time of the administrative hearing, Mr. Flores had worked in the family business for fourteen years. (Tr. 62).

[28] At the September 13, 2010 administrative hearing, the plaintiff testified as follows:

Q When did you become a citizen?

***

ALJ: When did she become a citizen? When –

ATTY: When did she become a citizen?

CLMT: 2000.

***

Q Did they test for that exam?

A It was in Spanish.

(Tr. 51).

question as to the claimant's ability to communicate in English," other than the ALJ's unsupported assumption that someone who has lived in the United States since 1979 must speak some English.

The ALJ's credibility findings were also based on other factors, including: (1) inconsistent records and testimony concerning when the plaintiff stopped working and what her job functions were and inconsistent reports concerning the plaintiff's driving abilities. (Tr. 33-34). With respect to the plaintiff's driving abilities, the ALJ's decision stated: "In describing her daily activities, the claimant testified that when she gets anxious, she takes the car and drives around. **I note that this contradicts one of her prior reports that she does not drive** (Exhibit 6E)." (Tr. 33) (emphasis added). The exhibit cited by the ALJ in support of the plaintiff's alleged contradictory prior statement that she does not drive does not discuss the plaintiff's driving abilities. See Exhibit 6E (Tr. 226-231). However, Exhibit 6F states: "She has a driver's license but lets her husband drive her to all her appointments." (Tr. 332). This is not the same as stating she does not drive. The plaintiff's testimony at the administrative hearing is consistent with a prior interview on September 22, 2008 which states: "She goes to the supermarket once a week. She drives to the supermarket and makes a list in order not to forget what she needs." (Tr. 221). The undersigned has reviewed the record in full and finds no support for the ALJ's conclusion that the plaintiff provided contradictory testimony concerning her driving activity.

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995). Here, the ALJ's credibility findings were based, in part, on the

ambiguous testimony of the plaintiff's son, unsupported assumptions concerning the plaintiff's ability to communicate in English and a non-existent, contradictory statement concerning the plaintiff's driving activities. Because this case is already due to be remanded based on the ALJ's errors concerning the plaintiff's medical record, see discussion supra, the Court does not reach the issue of whether the ALJ's errors concerning the plaintiff's credibility were harmless in light of the other reasons provided by the ALJ for finding the plaintiff less than fully credible. Rather, the Court directs that the plaintiff's credibility be reassessed on remand. See White v. Colvin, No. 3:12-cv-798-J-JRK, 2014 WL 631687, at *6 (M.D. Fla. Feb. 18, 2014) ("direct[ing] that [the p]laintiff's credibility be reassessed on remand" where "ALJ mischaracterized and/or incorrectly summarized [the p]laintiff's testimony."); Cosnyka v. Colvin, No. 13-3396-CV, 2014 WL 4099318, at *3 (2d Cir. Aug. 21, 2014) (stating that "[i]n light of the need for further factfinding, we do not reach appellant's remaining argument that the ALJ improperly rejected his subjective complaints of pain.").

        For the reasons stated above, the Court concludes that the RFC in the instant case is not supported by substantial evidence.

**3.      The VE's Testimony**

        Finally, the plaintiff argues that the VE's testimony at the September 13, 2010 administrative hearing was inconsistent with SSR 85-15 which defines the mental demands of unskilled work as "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting." See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE #

20-1 at 22, 3/22/13) (quoting SSR 85-15). Because of the errors outlined above, the case must be remanded for further proceedings. On remand, the ALJ will necessarily have to reconsider and weigh all of the evidence, formulate a new RFC and, if necessary, solicit new testimony from a VE. Accordingly, it is unnecessary to determine whether the VE's September 13, 2010 testimony was inconsistent with the Commissioner's policy and/or unsupported by substantial evidence.

**4.     Award of Benefits**

Because the ALJ's decision must be REMANDED, the Court must address the plaintiff's request that the Court order payment of benefits. See Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at 23, 3/22/13). Reversal for an award of benefits is warranted where: (1) the Commissioner has already considered the essential evidence and it establishes disability beyond a doubt or (2) where the plaintiff has suffered an injustice. See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). The instant case is being remanded because the ALJ's decision is not supported by substantial evidence. The record in this case does not establish that the plaintiff is disabled beyond a doubt or that she has suffered an injustice. The plaintiff's request that the case be reversed for an award of benefits is **DENIED**.

Alternatively, the plaintiff requests that the case be remanded "for further proceedings under sentence four,[29] with recommendations that a medical advisor in psychiatry be procured to address the plaintiff's impairments, and a vocational expert to address the impact of non-exertional impairments on the plaintiffs' ability to work." Memorandum of Law in Support of Motion for Judgment by the Pleadings (DE # 20-1 at

---

[29] Sentence four of section 405(g) states that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

23, 3/22/13) (footnote added). The plaintiff's alternative request is **DENIED**. The Court will leave these matters to the ALJ's discretion.

<u>**CONCLUSION**</u>

In accordance with the foregoing, it is

ORDERED AND ADJUDGED that the plaintiff's Motion for Judgment by the Pleadings (DE # 20, 3/22/13) is **GRANTED in part and DENIED in part** and the Defendant's Motion for Summary Judgment (DE # 24, 4/22/13) is **DENIED**. It is further

ORDERED AND ADJUDGED that the decision by the Administrative Law Judge is hereby **REVERSED** and the case is **REMANDED** for proceedings consistent with this Order.

**DONE AND ORDERED** in Chambers this **14th** day of October, 2014.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All Counsel of Record